**UNITED STATES BANKRUPTCY COURT**              FOR PUBLICATION
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ x
In re:                                                    :            **Chapter 11**
                                                          :
**NEW YORK SKYLINE, INC.,**                                :            **Case No. 09-10181 (SMB)**

                                 Debtor.                  :
------------------------------------------------------------------------x
**EMPIRE STATE BUILDING COMPANY L.L.C.**                   :
**and EMPIRE STATE BUILDING, INC.,**                       :            **Adversary Proceeding**
                                                          :            **No. 09-1107 (SMB)**
                                 Plaintiffs,              :
        v.                                                :
                                                          :
**NEW YORK SKYLINE, INC.,**                                :
                                 Defendant.               :
------------------------------------------------------------------------ x
**NEW YORK SKYLINE, INC.,**                                :
                                 Plaintiff,               :            **Adversary Proceeding**
        v.                                                :            **No. 09-1145 (SMB)**
                                                          :
**EMPIRE STATE BUILDING COMPANY L.L.C.,**                  :
**EMPIRE STATE BUILDING, INC. and EMPIRE**                 :
**STATE BUILDING ASSOCIATES L.L.C.,**                      :
                                                          :
                                 Defendants.              :
------------------------------------------------------------------------ x


**MEMORANDUM DECISION GRANTING IN PART AND DENYING
IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**


**A P P E A R A N C E S:**

STERN TANNENBAUM & BELL LLP
380 Lexington Avenue
New York, New York 10168

        David S. Tannenbaum, Esq.
        Francine S. Nisim, Esq.
        Karen S. Frieman, Esq.
                Of Counsel

        -and-

DUANE MORRIS LLP
1540 Broadway
New York, New York 10036

    Rudolph J. DiMassa, Esq.
    William C. Heuer, Esq.
       Of Counsel

Attorneys for Empire State Building Company L.L.C.,
  Empire State Building, Inc., and
  Empire State Building Associates L.L.C.

BACKENROTH FRANKEL & KRINSKY, LLP
489 Fifth Avenue
New York, New York 10017

    Mark Frankel, Esq.
       Of Counsel


    - and -


STEWART OCCHIPINTI, LLP
65 West 36th Street, 7th Floor
New York, New York 10018

    Charles A. Stewart, III, Esq.
    Frank S. Occhipinti, Esq.
       Of Counsel

Attorneys for New York Skyline, Inc.

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      At all relevant times, the debtor New York Skyline, Inc. ("Skyline") has operated a

simulator attraction called "SkyRide" (the "Attraction") on the second floor of the Empire State

Building (the "Building") in New York City. The Empire State Building Company L.L.C.

("ESBC") manages the Building, the Empire State Building, Inc. ("ESBI") owns the leasehold

for the observation decks located on the 86th and 102nd floors (collectively, the "Observatory"),

and although the record is not entirely clear, it appears that the Empire State Building Associates

L.L.C. ("ESBA") owns the fee interest.  ESBC, ESBI and ESBA are referred to collectively as "ESB."

Skyline and ESB are parties to lease and license agreements dating back to 1993, which have been modified from time to time.  These adversary proceedings concern a variety of disputes under those agreements.  Among other things, Skyline seeks to rescind the latest modification entered into on May 27, 2005 (the "May 2005 Agreement"), (<u>Affidavit of Francine Nisim</u>, sworn to July 17, 2009 ("<u>Nisim Affidavit</u>"), Ex. I (ECF Doc. # 15)),[1] and also challenges the method of computing the electricity charges that ESB is entitled to collect as additional rent.

ESB has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings to dismiss the Third and Twelfth Claims for Relief asserted in Skyline's Second Amended Complaint, dated May 1, 2009 ("SAC") (ECF Doc. # 5).[2]  ESB also seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the First, Third, Eleventh, Twelfth and Thirteenth Claims for Relief.  Skyline has cross-moved for partial summary judgment declaring that the lease provision that governs the computation of electrical charges is ambiguous.

Skyline has represented that it is no longer pursuing the Thirteenth Claim for Relief, and that claim is dismissed.  Although ESB's motion refers to the First Claim for Relief, its submissions do not discuss it, and that aspect of its motion is denied.  For the reasons that follow, the balance of ESB's motion is granted in part and denied in part and Skyline's cross-motion motion is denied.

---

[1]    Unless otherwise indicated, all citations to documents refer to those filed in Adversary Proceeding No. 09-1145.

[2]    Skyline has filed a Third Amended Complaint, dated July 29, 2009 (ECF Doc. # 30), which makes only one change to the SAC, and is discussed in the succeeding text.

3

# BACKGROUND

### A.    The Parties' Agreements

On or about February 26, 1993, ESB[3] and Skyline entered into a lease agreement (the "Original Lease"), (Nisim Affidavit, Ex. A), and a license agreement (the "Original License"). (Id., Ex. B.)  The Original Lease and License permitted Skyline to occupy space on the second floor in the Building and operate the Attraction.  The parties subsequently executed lease modification agreements on or about October 28, 1993, (id., Ex. C), and February 8, 1994, (id., Ex. D), and the latter expanded Skyline's leasehold premises to include space on the third floor.

In or about March 1996, ESB and Skyline entered into another lease modification, (id., Ex. E), and license modification (the "1996 License Modification").  (Id., Ex. F.)  Although § 4 of the Original License included a provision under which ESB agreed to sell tickets to the Attraction at the Observatory ticket office, the 1996 License Modification greatly expanded its obligation to promote the Attraction.  Among other things, ESB agreed to (1) instruct its employees to solicit Observatory ticket purchasers to purchase a ticket to the Attraction at the same time on a combination basis,  (1996 License Modification at § 1.A), (2) include Attraction promotional materials in all written group sales solicitations, (id. at § 1.B(i)), (3) provide Skyline with Observatory tickets under the most favorable terms and conditions offered to tour operators and wholesale purchasers who buy on a group sales basis, (id. at § 1.D), (4) subject to restrictions, allow Skyline to reward Observatory employees based upon their sale of combination tickets and "the general demeanor of such employees in favorably depicting the Attraction," (id. at § 1.E), and (5) include information about the Attraction in any pre-recorded telephone message providing information to the public.  (Id. at § 1.G.)

---

[3]    In some cases, a predecessor of the ESB entered into the lease or modification.  Unless otherwise noted, any reference to ESB includes any predecessor.

The 1996 License Modification also granted Skyline expanded rights concerning signage. Under § 2, Skyline obtained the right, subject to ESB's written approval which it could not withhold unreasonably, to install four 32-inch video monitors in the 80th floor Observatory lobby staging area and the ticket sales office for the Observatory.

On or about December 30, 1999, and as part of a resolution of litigation between the parties, ESB and Skyline executed a Third Amendment of Lease, (Nisim Affidavit, Ex. G), and a Second Modification of License Agreement.  (Id., Ex. H.)  The latter did not alter the promotion obligations that ESB had undertaken in the 1996 License Modification.  The Original Lease and License, as amended up to the adoption of the May 2005 Agreement, will be referred to as the Existing Lease and License.

**B.** **The Events Leading Up To the May 2005 Agreement**

Prior to April 2005, the ticket office for the Observatory was located in the concourse or basement level of the Building.  The traffic flow from the ticket office to the Observatory was generally such that after visitors purchased tickets in the concourse, they (1) traveled up an escalator to the ground floor of the building in the 33rd Street corridor, (2) moved west down the corridor and (3) went up escalators located at the west end of the corridor (the "West Escalators") to the second floor where they passed through security.  After clearing security, visitors took the elevators to the Observatory.  Visitors to Skyline also used the West Escalators to access Skyline's premises.  Although the Original Lease provided that "Tenant shall have two entrances to the demised premises as indicated on the attached plans," neither the Original Lease nor Original License, as modified, expressly provided that Skyline would have access to its premises through the West Escalators.

5

In April 2005, ESB moved the Observatory ticket office from the concourse to the second floor of the Building. Skyline did not contest its right to do so. The relocation of the Observatory ticket office resulted in a change in the traffic flow of the Building, and dramatically affected Skyline's operations. Visitors to the Observatory were now directed to enter the Building on Fifth Avenue, go up escalators located in the Fifth Avenue lobby to the second floor of the Building, and pass through security in the Observatory ticket office before entering the Observatory. In addition, although Skyline contends that its customers were always permitted to merge into the Observatory ticket holders' line, ESB was directing them to the end of the Observatory line and prohibiting them from merging into it.

The most significant issue concerned the West Escalators. Until April 2005, the Skyline customers traveled up the West Escalators to enter the Attraction. According to Skyline, this was the only means of ingress to its premises. When the new Observatory ticket office opened, ESB reversed the direction of the West Escalators. As a result, they only went down, and served solely as a means of exit for visitors to the Observatory and the Attraction.

The reversal of the West Escalators ignited litigation; one month later, Skyline commenced an action against ESB in the Supreme Court of New York, County of New York. Skyline sought, inter alia, declaratory, injunctive and monetary relief relating to its alleged right to access its premises through the West Escalators under the Original Lease as well as at common law. (Nisim Affidavit, Ex. M.) Skyline also sought a preliminary injunction regarding the reversal of the West Escalators, and obtained a temporary restraining order prohibiting ESB from reversing the West Escalators until a determination was made on Skyline's motion for a preliminary injunction. (Id., Ex. N.) Prior to the hearing on that motion, the parties settled by

executing the May 2005 Agreement, and stipulated to discontinue the action <u>with prejudice</u>.  (<u>Id.</u>,
Ex. P.)

### C.    The May 2005 Agreement

The May 2005 Agreement was intended to resolve the dispute that triggered the litigation
as well as some other (but not all) disputes between the parties involving many of their rights and
obligations under the Existing Lease and License.  It included the following terms:

1.    ESB and Skyline agreed to discontinue the May 2005 Action with prejudice, and
the parties exchanged mutual releases.

2.    ESB agreed to allow Skyline access to its premises through the West Escalators,
and to allow Skyline's guests to merge into the line for the Observatory at a
specific merger point and at a set rate.

3.    Skyline agreed to install certain security measures and pay the cost of security
guards in the annual amount of $335,000 (the "Security Fee") so that its
customers would not have to go through security in the Observatory ticket office
before entering its premises, and instead, could be screened at the top of the West
Escalators before entering its own premises.  Skyline also agreed to pay an annual
access fee of $450,000 (the "Access Fee").

4.    The parties disputed the right of the Skyline customers to use the restrooms in the
Observatory ticket office.[4]  The May 2005 Agreement expressly granted
Skyline's guests the right to use the restrooms in the Observatory ticket office.

5.    ESB had contended that Skyline had breached the change of control provisions of
the Existing Lease and License when Skyride Associates LLC purchased the debt
of Skyline and Frederick Schulman purchased the stock of its parent, Skyline
Multimedia Entertainment, Inc.  ESB consented to any change in ownership or
control of Skyline that had occurred prior to April 1, 2005.

6.    ESB agreed to allow Skyline to place certain signage in the Building and in the
Observatory ticket office, and acknowledged its obligation in the 1996 License
Modification to allow Skyline to install four video monitors in the Observatory
ticket office.

7.    The May 2005 Agreement invalidated the provisions contained in the 1996
License Modification that obligated Observatory employees to promote the
Attraction.

---

[4]    The parties dispute the precise location of the restrooms.

7

Skyline thereafter enjoyed the benefits expressly granted under the May 2005 Agreement. ESB has allowed Skyline's customers to access Skyline's premises through the West Escalators and merge into the line for the Observatory at the merger point specified in the May 2005 Agreement, and has allowed Skyline's guests to use the restrooms in the Observatory ticket office.  In addition, ESB has sold Observatory tickets to Skyline at the discounted rates specified in the May 2005 Agreement.  Finally, Skyline has installed all signage identified in the May 2005 Agreement, except for the directional sign identified in paragraph 10(a) of the May 2005 Agreement, and one of three A-Frame signs identified in paragraph 10(f) of the May 2005 Agreement.

The video monitors have been a source of contention.  As stated earlier, the May 2005 Agreement did not grant Skyline the right to install video monitors.  Instead, paragraph 11 of the May 2005 Agreement stated:

> ESBC acknowledges the License provisions concerning NYSR's [Skyline's] plasma television screens ("the Screens").  Without waiving or in any way compromising the aforementioned provisions, NYSR agrees to explore suitable alternatives with ESBC in good faith.

Thus, whatever rights Skyline had regarding the use of video monitors arose under the Existing License.  In fact, the May 2005 Agreement imposed an obligation on Skyline to "explore suitable alternatives," but did not impose any obligation on ESB relating to the video monitors.[5]

Other than the signs and video monitors, the only other disputes between ESB and Skyline with respect to the implementation of the express terms of the May 2005 Agreement

---

[5]    ESB contends that it identified locations where Skyline could install four video monitors in the Observatory ticket office, and asked Skyline to provide plans and specifications to ESB to be approved prior to installation. Skyline never submitted plans and specifications to ESB in order to install any video monitors in the Observatory ticket office, but Skyline contends that the Director of the Observatory told it not to do so.  Skyline presently has one video monitor in the Observatory ticket office.

relate to (1) whether Skyline is permitted to escort groups of 25 or more through the Lobby

pursuant to paragraph 7(c) of the May 2005 Agreement, and (2) whether ESB is permitted to

enforce the protocol in paragraph 7 of the May 2005 Agreement without first informing Skyline

and requesting that Skyline enforce the protocol directly.

### D.    Aftermath

Skyline contends that it entered into the May 2005 Agreement to buy "peace," but it soon

discovered that it got anything but that.  Walter Threadgill, a representative of Skyline's secured

creditor who was involved with Skyline in its attempt to resolve the dispute with ESB, testified

that within two months, he recognized that the relationship had not improved.  ESB was sending

its lawyers on walkthroughs looking for scratches on the wall, and "three-day notices" followed

the walkthroughs in short order.  It became so bad that ESB's lawyers admitted that they were

embarrassed.  Threadgill summed the situation up tersely, stating "so it was clear to me shortly

after the settlement agreement was signed, the reign of terror was continuing."  (Deposition of

Walter Threadgill, dated June 29, 2009, at 104 (Nisim Affidavit, Ex. X); see SAC, at ¶¶ 69, 71,

74.)[6]  Despite the continuing reign of terror, Skyline did not commence any legal action against

ESB relating to the May 2005 Agreement until ESB served it with a Notice to Cure in July 2008,

more than three years later, which prompted Skyline to seek a "Yellowstone" injunction.

### E.    This Proceeding

Skyline filed this chapter 11 case on January 12, 2009.  ESB commenced the above-

captioned adversary proceeding against Skyline on March 4, 2009, removed Skyline's pending

state court action on or about March 30, 2009, and filed an answer and counterclaims on May 22,

---

[6]    Frederick Schulman, Skyline's Chairman, took a bit longer to pick up on the continuing reign of terror.  He
testified that "we" started to feel that ESB was being disingenuous within "six months or so."  (Deposition of
Frederick Schulman, dated June 30, 2009, at 121 (Nisim Affidavit, Ex. W).)  He then backtracked, stating that the
realization was a process that might have taken two or three years.  (Id.)

2009.  This Court denied Skyline's motion to remand or abstain primarily because the issues

were intertwined with the issues raised by Skyline's anticipated motion to assume some or all of

its agreements with ESB.  In addition, remand (or abstention) would still leave the ESB

proceeding pending in this Court, and Skyline might have to assert and litigate its state court

claims as compulsory counterclaims in the ESB proceeding.

ESB eventually moved for judgment on the pleadings, FED. R. CIV. P. 12(c), and

summary judgment dismissing several of the claims asserted in the Second Amended Complaint.

FED. R. CIV. P. 56.  The ESB motion attacked two categories of Skyline claims: (1) rescission of

the May 2005 Agreement and (2) the challenge to the computation of electricity service charges.

Skyline cross-moved for partial summary judgment and sought a determination that the

electricity service provision was ambiguous.

About the same time that the parties were briefing the cross-motions, Skyline moved to

assume its Existing Lease with ESB.  (See Motion to Assume Lease, dated July 20, 2009 (ECF

Doc. # 38, filed in Case No. 09-10181).)  Although the motion did not mention the Existing

License or the May 2005 Agreement, it was expanded to cover all of the agreements.  The Court

conducted an evidentiary hearing, and granted the motion over ESB's objection.  (Order

Granting Motion to Assume Lease, dated Sept. 17, 2009 (ECF Doc. # 57, filed in Case No. 09-

10181).)

# DISCUSSION

## A.    Standards Governing Motions

### 1.    Judgment on the Pleadings

A motion under Rule 12(c) for judgment on the pleadings is judged by the same

standards as a motion under Federal Civil Rule 12(b)(6).  Patel v. Contemporary Classics of

Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).  On a motion to dismiss a complaint under Rule

12(b)(6), a court must "accept all factual allegations in the complaint as true," Tellabs, Inc. v.

Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007), but need not credit legal conclusions

or "threadbare recitals of the elements of a cause of action supported merely by conclusory

statements."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  The complaint must assert a claim

that is plausible, and where the well-pleaded facts do not imply more than a mere possibility of

misconduct, it fails to show that the pleader is entitled to relief.  Id. at 1950.

"[C]ourts must consider the complaint in its entirety, as well as other sources courts

ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents

incorporated into the complaint by reference, and matters of which a court may take judicial

notice."  Tellabs, 127 S. Ct. at 2509.  Courts may also consider, among other things, any written

instrument attached to the complaint as well as documents the pleader possessed or knew of and

relied on in bringing the suit.  ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.

2007).  "Where a plaintiff's conclusory allegations are clearly contradicted by documentary

evidence incorporated into the pleadings by reference, however, the court is not required to

accept them."  Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007).

2.       **Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding by Fed. R. Bankr. P. 7056, governs summary judgment motions.  A court must grant

summary judgment "if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the

initial burden of showing that the undisputed facts entitle him to judgment as a matter of law.

Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  If the movant carries this

initial burden, the nonmoving party must set forth specific facts that show triable issues, and

cannot rely on pleadings containing mere allegations or denials.  FED. R. CIV. P. 56(e);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); see Celotex

Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In deciding whether material factual issues exist, all

ambiguities must be resolved and all inferences must be drawn in favor of the nonmoving party.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587.

B.       **The Rescission Claim**

Rescission involves a power under state law to avoid a contract by disaffirming it.  See

DAN B. DOBBS, LAW OF REMEDIES § 4.3(6), at 614 (2d ed. 1993) ("A rescission is the avoidance

of a transaction."); 1 JOSEPH M. PERILLO, CORBIN ON CONTRACTS ¶ 1.6, at 18 (Rev. ed. 1993)

("A contract that is induced by fraud is 'voidable' by the injured party who has the power of

avoidance.").  The party asserting a rescission claim under New York law must plead and

ultimately prove (a) a lawful right to rescind, (b) prompt notice of an intention to rescind, and (c)

the restoration of the status quo.  See Cox v. Stokes, 51 N.E. 316, 320-21 (N.Y. 1898).  To

demonstrate a lawful right to rescind, the plaintiff must plead and prove fraud in the inducement

of the contract, failure of consideration, an inability to perform the contract after it is made, or a

breach of the contract that substantially defeats the purpose for which it was made.  New Paradigm Software Corp. v. New Era of Networks, Inc., 107 F. Supp. 2d 325, 329 (S.D.N.Y. 2000).  Because rescission is an equitable remedy, the party must also show that it lacks an adequate remedy at law.  Id.  A party having the right to rescind may instead elect to assert a claim for damages.  See Keywell Corp. v. Weinstein, 33 F.3d 159, 165 (2d Cir. 1994); Hangzhou Silk Import & Export Carp. v. P.C.B. Int'l Indus., Inc., Case No. 00-CV-6344 (RLC), 2002 WL 2031591, at *4 (S.D.N.Y. Sept. 5, 2002); Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland, 768 F. Supp. 115, 117 (S.D.N.Y. 1991); In re Mid-Island Serv. Corp., 472 F. Supp. 1196, 1197 (E.D.N.Y. 1979); Vitale v. Coyne Realty, Inc., 414 N.Y.S.2d 388, 393 (N.Y. App. Div. 4th Dep't 1979); see N.Y.C.P.L.R. § 3002(e).

The parties have spilled a great deal of ink on the rescission claim, due in large part to questions raised by the Court.  In the course of the additional briefing, three specific threshold legal issues emerged:  (1) is the May 2005 Agreement independent of or divisible from the Existing Lease and License; (2) did Skyline's assumption of the May 2005 Agreement create an absolute bar to the rescission claim; and (3) does the Court's inability to vacate the state court stipulation of dismissal with prejudice prevent the Court from restoring the parties to the status quo?  The answers to these questions, discussed below, provide three independent grounds for granting summary judgment dismissing the rescission claim.

### 1.    Rescission Limited to the May 2005 Agreement

In its Third Claim for Relief, Skyline seeks to rescind the May 2005 Agreement but not the Existing Lease and License.[7]  (SAC at ¶¶ 123-35.)  Skyline conceded at the May 13, 2010

---

[7]        The Third Claim for Relief also seeks a declaration that "under the License Agreement and/or the parties' course of conduct, holders of combination tickets are entitled to merge from the Premises into the Observatory line on the Second Floor and are not required to return to the beginning of the Observatory line to visit the Observatory."

oral argument that the May 2005 Agreement and the Existing Lease and License were a single indivisible agreement for purposes of assumption under 11 U.S.C. § 365.  It contended, however, that it was a separate agreement for purposes of rescission.  Not surprisingly, Skyline cited no legal support for this proposition.

In fact, the law is contrary because the same test applies in both situations.  "When the debtor assumes the lease or the contract under § 365, it must assume both the benefits and the burdens of the contract.  Neither the debtor nor the bankruptcy court may excise material obligations owing to the non-debtor contracting party."  City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1226 (6th Cir. 1995); accord In re S.E. Nichols Inc., 120 B.R. 745, 747 (Bankr. S.D.N.Y. 1990) ("It is well-settled that a debtor cannot assume part of an unexpired lease while rejecting another part; the debtor must assume the lease in toto with both the benefits and burdens intact.")

Sometimes, the debtor will seek to assume or reject one or more of several related agreements.  The question in those circumstances is whether the agreement to be assumed or rejected is separate from the other agreements, or alternatively, whether all of the agreements are one indivisible agreement that must be assumed or rejected in toto.  See Coudert Bros. LLP v. 1114 6th Ave. Co. LLC (In re Coudert Bros.LLC), No. 09 Civ. 5047 (DLC), 2009 WL 2868722, at *4 (S.D.N.Y. Sept. 4, 2009) ("A central issue in this case is whether the Lease and Lease Amendment are one entire contract that Coudert assumed, or two severable contracts, only the former of which was assumed.").  It is well-settled that state law governs whether the agreements

---

(SAC at ¶ 135.)  In other words, they are entitled to the specific merging rights expressly granted under the May 2005 Agreement even if the latter is rescinded.  ESB did not challenge this aspect of the Third Claim in its submissions, and the Court does not consider it.  Nevertheless, the request for declaratory relief is premised on the rescission of the May 2005 Agreement, and the rescission claim is being dismissed.  Since Skyline has these rights by contract, it seems unnecessary to declare whether it also has these rights without regard to the contract.

14

are separate or indivisible for purposes of § 365.  Id.; S.E. Nichols, 120 B.R. at 748; see In re

Teligent, Inc., 268 B.R. 723, 728 (Bankr. S.D.N.Y. 2001).

The same state law principles determine whether a party may rescind one of several

agreements.  In Ripley v. International Rys. Of Central Am., 171 N.E.2d 443 (N.Y. 1960), the

minority shareholders of the International Railways of Central America ("IRCA") sued the

United Fruit Company ("United"), contending that United had used its control of IRCA, a

transportation company, to obtain advantageous freight rates to the detriment of IRCA.  United

countered that the rates were fixed under an earlier 1936 agreement, the time to rescind that

agreement had expired, and absent rescission, the plaintiff could not challenge the rates.  Id. at

445.  The Court explained the underlying legal principle in the following manner:

> When a contract is separable or divisible into a number of elements or
> transactions, each of which is so far independent of the others that it might stand
> or fall by itself, and good cause for rescission exists as to one of such portions, it
> may be rescinded and the remainder of the contract affirmed.

Id. (internal quotation marks and citation omitted); accord First Savs. & Loan Ass'n v. American

Home Ins. Co., 277 N.E.2d 638, 639 (N.Y. 1971) ("As a general rule, a contract is entire when

by its terms, nature, and purpose, it contemplates and intends that each and all of its parts and the

consideration therefor shall be common each to the other and interdependent.  On the other hand,

the contract is considered severable and divisible when by its terms, nature, and purpose, it is

susceptible of division and apportionment.") (internal quotation marks and citation omitted).

The same principle applies where, as in the matter before the Court of Appeals, the contract may

consist of several agreements.  Ripley, 171 N.E.2d at 446 ("The circumstance that they are

different documents does not necessarily mean that they do not form a single contract (Crabtree

v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551), but it does indicate that they are

15

separate unless the history and subject matter shows them to be unified.").[8]   The Court ultimately

concluded that the 1936 agreement and other agreements were separate.

The current case presents a variation nonetheless governed by the identical rule.  Here,

the parties entered into a subsequent agreement that purported to modify the Existing Lease and

License.  "To determine whether a particular lease has been modified by a subsequent agreement

or, alternatively, the subsequent agreement constitutes a separate contract, courts must look at the

substance of the lease rather than at its form or title."  Coudert Bros., 2009 WL 2868722, at *4.

"[A] subsequent agreement, in order to be a modification and deemed part of a single contract,

must do more than label itself an amendment or incorporate terms and provisions from the earlier

agreement: it must alter original terms and provisions in the first agreement."  S.E. Nichols, 120

B.R. at 749.  Where a subsequent agreement modifies the terms of an earlier agreement, "the

lease and the modification must be taken together and construed as one contract in order to effect

the intention of the parties."  Id. at 748.

Skyline's concession that the Existing Lease and License and the May 2005 Agreement

are one agreement for purposes of assumption essentially concedes the same position on

rescission.  Although Skyline tried to articulate different tests for assumption and rescission, the

determination of whether multiple agreements are one contract or separate agreements is

determined in both cases in accordance with the same state law principles.

Even if Skyline had not conceded its position, an examination of the May 2005

Agreement and the Existing Lease and License demonstrates that they are indivisible.  At the

---

[8]       In Crabtree, the Court of Appeals considered whether the statute of frauds was satisfied if the agreement
was contained in a number of documents, some signed, some unsigned.  The Court adopted the rule "permitting the
signed and unsigned writings to be read together, provided that they clearly refer to the same subject matter or
transaction."  110 N.E.2d at 554.

outset, the May 2005 Agreement expressly canceled portions of the 1996 License Modification.

Paragraph 7(e) of the former stated: "The provisions of paragraphs A, B(i), D, E, and G of

Section 1 (Ticket Sales) of the License Modification Agreement dated March 1996 shall be of no

further force and effect." It also modified the rent provisions under the Existing Lease, stating

that "[a]ll amounts payable under this Agreement by NYSR and its employees shall be due as

additional rent under the Lease."

In addition, other provisions of the May 2005 Agreement altered the parties' rights under

the Existing Lease and License without specifically referring to the earlier agreements. The May

2005 Agreement wove all modifications into the text of the Existing Lease and License:

> Each of the Lease and the License remains in effect in accord with its
> terms without waiver, except that any term thereof shall be deemed to be modified
> hereby to the extent required to cause all the terms of this Agreement to be given
> full effect, so that any term in the Lease or the License which specifically
> contradicts a term of this Agreement shall be deemed of no further effect. Each
> term herein shall be incorporated into the covenants and conditions of the Lease
> (including, without limitation, Article 42 thereof regarding use) and the License.

(May 2005 Agreement at ¶ 17.)[9] For example, Article 31 of the Original Lease required ESB to

"provide escalator or elevator service to the demised premises during the hours that Tenant is

required to be open for business under Article 44D." The Original Lease did not designate any

particular escalator, and access to the West Escalators became a battleground. The May 2005

Agreement modified the Original Lease, stating that Debtor "shall have access to its leased

premises ("NYSR Premises") from the Building lobby (the "Lobby") through the escalators

---

[9]    The May 2005 Agreement, at 1, incorporates the terms used in the Existing Lease and License, and
recognizes its continuing force and effect:

> Unless otherwise defined herein, terms are used as defined in the Parties' (a) February 26, 1993
> Lease, as amended and modified by amendments and modifications dated February 8, 1994,
> March 1996, and December 30, 1999 (as so amended and modified, the "Lease"), and (b)
> February 26, 1993 License Agreement, as amended and modified by amendments and
> modifications dated March 1996 and December 30, 1999 (as so amended and modified, the
> "License"). Those agreements remain in full legal force and effect subject to the following.

17

located in the west corridor of the Lobby (the "West Escalators"), as a means of access

referenced under the Lease."  (May 2005 Agreement at ¶ 1.)

Article 44(B)(1)(k) of the Original Lease required Skyline to imprint its tickets with the

statement that it was not affiliated with ESB, and Article 44(E) further stated, inter alia, that Skyline

could not use ESB's name in connection with the promotion of its business without ESB's prior

written consent.  ESB agreed that it would not unreasonably withhold its consent for first class

dignified advertisements that did not detract from or impair the dignity, image or reputation of

the Building.  Under paragraph 9 of the May 2005 Agreement, Skyline acknowledged that the

Building design was a trademark and "Empire State Building" was trade name, both owned by

ESB, ESB agreed to allow Skyline to distribute its existing stock of promotional materials, but

required the new promotional materials to include the disclaimer "New York SkyRide Theater is

an independent business and is not affiliated with the owner of the Empire State Building or the

Observatory at the top of the Empire State Building."

Article 4 of the 1996 License Modification required Skyline representatives to wear

"dignified business apparel reasonably designated by Licensor, i.e., suit and tie for men and a

suit or dress for women, and shall in no event wear jeans, sneakers or t-shirts."  Paragraph 7(d) of

the May 2005 Amendment stated that Skyline's representatives

> must be in dress code of tie plus jacket or sweater-vest with SkyRide badge/logo,
> effective within thirty (30) days of the date on which a dress code of a tie plus
> jacket or sweater-vest is implemented by ESBC for Visitor Center employees (it
> being agreed that prior to such date such dress code for NYSR employees and
> representatives shall be dark slacks or skirts and collared shirts).  NYSR shall
> maintain within its sole discretion the color of the uniform as well as the design
> and color of SkyRide badge/logo, so long as the SkyRide color and badge/logo
> are readily distinguishable from the ESBC color and badge/logo.

In addition, while Article 4 of the 1996 License Modification allowed Skyline to place three

representatives in the Observatory Ticket Office, paragraph 7(d) of the May 2005 Agreement

18

limited Skyline to not more than two representatives in the pre-security waiting area and not more than two others in the Visitor Center box office area, "all subject to direction from Observatory staff to assure that such employees or representatives do not impede good order and traffic flow in the Observatory line."

While the May 2005 Agreement expressly or implicitly modified and even canceled provisions in the Existing Lease and License, there is a more basic reason for concluding that it cannot be separated from the Existing Lease and License; the May 2005 Agreement cannot "stand or fall by itself." Ripley, 171 N.E.2d at 445. This is not a case where the subsequent agreement granted a tenant additional space to occupy, and arguably, could exist independently from an earlier lease that covered different space. The May 2005 Amendment did not grant Skyline an independent right to occupy space in the Building or operate the Attraction. Those rights were derived from the Existing Lease and License. In addition to what has already been described, the May 2005 Agreement covered the sale of Combination Tickets to the Observatory and the Attraction, (¶ 2), the use of restrooms, (¶ 3), the payment of Access and Security Fees, (¶ 4), reimbursement of security costs, (¶ 5), and signage. (¶ 10.) If there were no Existing Lease and License, these provisions would be meaningless, and could not stand alone. Accordingly, the May 2005 Agreement is indivisible from the Existing Lease and License, and Skyline cannot rescind it without also rescinding the Existing Lease and License. As Skyline does not seek to rescind the Existing Lease and License, its rescission claim falls on this ground alone.

## 2.    The Assumption of the May 2005 Agreement

At the same approximate time that the parties were briefing the motions, Skyline moved to assume its agreements with the ESB Parties, a motion that ultimately included the May 2005 Agreement. Following an evidentiary hearing, the Court granted the motion. At the Court's

19

request, the parties briefed the issue of whether the assumption of the May 2005 Agreement cut off Skyline's right to rescind it.  The Court concludes that it did.

As noted earlier, rescission is a remedy that permits a party to avoid a voidable transaction.  The party may nonetheless elect to ratify or affirm the transaction, although the ratifying act may not be intentional.  Ratification or affirmance will occur whenever the party has reason to know of the ground for avoidance (e.g., fraud, mistake) but "manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance."  RESTATEMENT (SECOND) OF CONTRACTS § 380(2) at 234; accord Banque Arabe et Internationale D'Investissement v. Maryland. Nat'l Bank, 850 F.Supp. 1199, 1212-13 (S.D.N.Y. 1994) ("[I]ntentional acts, performed in recognition of a contract as valid, result in a ratification of a previously voidable contract and bar rescission.") (internal quotation marks and citation omitted), aff'd, 57 F.3d 146 (2d Cir. 1995); RESTATEMENT (SECOND) OF CONTRACTS § 380(2), cmt a, at 234 ("A party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract.").

Skyline made and prosecuted its assumption motion at the same time as its rescission claim, so it knew the facts surrounding its right to rescind.  The question posed is whether the assumption of the May 2005 Agreement constituted a ratification or affirmance under state law. Under section 365 of the Bankruptcy Code, a debtor may assume or reject an executory contract or unexpired lease.  The decision is forward looking, and does not affect the rights and obligations that have already accrued; "the issue of affirmance or rejection relates only to those aspects of the contract which remained unfulfilled as of the date the petition was filed." Delightful Music, Ltd. v. Taylor (In re Taylor), 913 F.2d 102, 106 (3d Cir. 1990).  "Assumption is in effect a decision to continue performance.  It requires the debtor to cure most defaults and

continues the parties' rights to future performance under the contract or lease." In re Penn

Traffic Co., 524 F.3d 373, 378 (2d Cir. 2008).  Rejection, on the other hand, "is in effect a

decision to breach the contract or lease." Id.  Rejection is not the equivalent of rescission

because rejection is not an avoiding power.  In re Seymour, 144 B.R. 524, 530 (Bankr. D. Kan.

1992).

 Research has not disclosed any case that addressed whether assumption forecloses

rescission.  This may be because a debtor who wishes to pursue a cause of action to rescind a

contract should "obviously not assume it." In re A. Tarricone, Inc., 70 B.R. 464, 466 (Bankr.

S.D.N.Y. 1987).  Instead, a debtor with the power to rescind an uneconomical or onerous

contract should simply reject it.  If the non-debtor party thereafter asserts a rejection damage

claim, the debtor can assert the right to rescind as an equitable defense.  See Mercantile &

General Reinsurance Co., PLC v. Colonial Assurance Co., 624 N.E.2d 629, 630 (N.Y. 1993).

Furthermore, the debtor can sue the non-debtor party for damages caused by the actions that also

provide a basis for rescission.

 Here, Skyline took the unusual route of assuming a contract it was seeking to rescind.  At

the recent oral argument, it suggested that it had no choice; it maintained that the May 2005

Agreement and the Existing Lease and License were an indivisible contract for purposes of

assumption but not rescission.  As discussed above, this was wrong because the tests are the

same.  Whatever the reason, the assumption manifested Skyline's recognition that the May 2005

Agreement was valid and its decision to continue to perform under it.  These actions constituted

a ratification under state law.  Indeed, Skyline continues to receive the benefit of the

performance that ESB is required to render including the use of the West Escalator and the right

of Skyline patrons to merge into the Observatory line.[10]

Skyline nevertheless argues that under Orion Pictures Corp. v. Showtime Networks, Inc.

(In re Orion Pictures Corp.), 4 F.3d 1095 (2d Cir. 1993), cert. dismissed, 114 S. Ct. 1418 (1994) and

its progeny, the assumption cannot bar the rescission claim.  In Orion, the debtor had entered into a

pre-petition contract with Showtime.  Showtime contended that Orion had breached the agreement

and could not assume it.  Orion moved to assume the contract and simultaneously commenced an

adversary proceeding against Showtime claiming anticipatory breach.  The bankruptcy court tried

the breach issue in connection with the assumption motion.  Finding no breach, it authorized

assumption and dismissed the related adversary proceeding as moot.  The District Court affirmed.

Reversing the lower courts, the Second Circuit explained that the bankruptcy court had

"erred because it misapprehended the fundamental nature and purpose of the motion to assume."

Id. at 1098.  A motion to assume a contract is summary, and should be efficient and swift.  Id.  It is

not the time for prolonged discovery or a lengthy trial involving disputed issues.  Id. at 1098-99.

Section 365 did not authorize the bankruptcy court to resolve questions involving the validity of

contracts in the context of assumption motions.  Id. at 1099.  Instead, the bankruptcy court should

exercise its business judgment like any other businessman who lacks the ability to resolve disputed

---

[10]     Skyline has accepted these and other benefits granted by the May 2005 Agreement since it was signed.
Skyline first asserted a rescission claim in its amended complaint, dated September 19, 2008, and only after ESB served it
with a Notice to Cure.  Even then, Skyline only sought to rescind the Access and Security Fees and not the entire May
2005 Agreement.  The acceptance of benefits under a contract after discovering grounds to rescind constitutes an
affirmance of the contract and bars the rescission claim.  Hangzhou Silk Import, 2002 WL 2031591, at *4 ("[T]he
acceptance of benefits under a contract subsequent to the discovery of fraud constitutes affirmance of the contract,
and, therefore, acts as a bar to attempts by the defrauded party to rescind the contract.").  Skyline's acceptance of
benefits after learning of the grounds for rescission (the continuing "reign of terror") supplies an additional reason to
conclude that it ratified the May 2005 Agreement.

issues.  Id.  Furthermore, its assumption decision is not a "formal ruling on the underlying disputed

issues, and thus will receive no collateral estoppel effect."  Id.

Citing Orion as well as this Court's subsequent decision in In re 611 Sixth Avenue Corp.,

191 B.R. 295 (Bankr. S.D.N.Y. 1996), Skyline contends that the assumption decision has no

preclusive effect, and cannot foreclose the rescission claim.  The argument misunderstands the

issue raised by its act of assumption.  The Court never suggested and ESB never argued that the

Court made factual determinations in the course of the assumption motion that undercut the

rescission claim.  In other words, the findings made in connection with the assumption motion do

not collaterally estop Skyline from arguing that it was defrauded by ESB, that the consideration

for the May 2005 Agreement failed or that ESB committed substantial breaches of the May 2005

Agreement.  Indeed, Skyline is still free to pursue damage claims on account of any wrongdoing

by ESB.  Instead, Skyline's assumption of the May 2005 Agreement constituted an act of

ratification without regard to the underlying merits of its rescission claim.  Neither Orion nor any

other case has decided this issue, undoubtedly for the reason articulated by Bankruptcy Judge

Schwartzberg in Tarricone: a debtor who wishes to pursue a cause of action to rescind a contract

should "obviously not assume it."  There are no cases because except for Skyline, no debtor

would attempt to assume a contract it was seeking to rescind—it would just reject the contract.

Accordingly, the Court concludes that Skyline's assumption of the May 2005 Agreement

at a time when it knew of the facts that formed the basis of its rescission claim constitutes a

ratification of the May 2005 Agreement that bars the rescission claim.

### 3.        The Dismissal With Prejudice

After ESB changed the direction of the West Escalators, Skyline commenced a lawsuit.

The gravamen of the action was that ESB had violated Skyline's rights under the Lease and at

common law by blocking access to its premises via the West Escalator.  Its state court complaint, (<u>Nisim Affidavit</u>, Ex. M), asserted five claims for relief.  First, Skyline sought, <u>inter alia</u>, a declaration that it had a right under its Lease and at common law to use the West Escalators to access its premises.  (<u>Id.</u> at ¶¶ 32-38.)  Second, it sought preliminary and permanent injunctive relief preventing ESB from blocking access to its premises by way of the West Escalators.  (<u>Id.</u> at ¶¶ 39-43.)  Third, it sought injunctive relief relating to the removal of certain signage.  (<u>Id.</u> at ¶¶ 44-48.)  Fourth, it sought money damages based upon the breach of Article 17 of the Lease and its common law rights relating to the use of the West Escalators and the removal of its signage.  (<u>Id.</u> at ¶¶ 49-55.)  Fifth, Skyline sought money damages based upon the alleged breach of Articles 31 and 62 of the Lease and its common law rights relating to the use of the West Escalators.  (<u>Id.</u> at ¶¶ 56-63.)  The May 2005 Agreement settled that action as well as other disputes, and in accordance with paragraph 13 of the May 2005 Agreement, the parties executed a stipulation stating that the state court "action is discontinued in its entirety with prejudice." (<u>Nisim Affidavit</u>, Ex. P.)

"Under applicable law, a discontinuance with prejudice is deemed a final adjudication on the merits for <u>res judicata</u> purposes on the claims asserted or which could have been asserted in the suit."  <u>NBN Broadcasting, Inc. v. Sheridan Broadcasting Networks, Inc.</u>, 105 F.3d 72, 78 (2d Cir. 1997); <u>accord</u> <u>Samuels v. Northern Telecom, Inc.</u>, 942 F.2d 834, 836 (2d Cir. 1991) ("A stipulation dismissing an action with prejudice can have the preclusive effect of <u>res judicata</u>."); <u>Nemaizer v. Baker</u>, 793 F.2d 58, 60 (2d Cir. 1986) ("A dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action.").  <u>Res judicata</u> bars subsequent claims arising under same transaction "even if based upon different theories or if seeking a different remedy."  <u>O'Brien v. City of Syracuse</u>, 429 N.E.2d 1158, 1159 (N.Y. 1981); <u>accord</u> <u>Nottenberg v. Walber 985 Co.</u>,

554 N.Y.S.2d 217, 218 (N.Y. App. Div. 1990).  Moreover, a party may not seek relief from a

stipulation in a court other than where it was originally entered.  See Lavigna v. Capital Cites

/ABC, Inc., 665 N.Y.S.2d 410, 411 (N.Y. App. Div. 1997) (refusing to permit collateral attack

on stipulation of dismissal with prejudice entered in federal court).

Skyline concedes that I cannot vacate the state court stipulation of discontinuance with

prejudice; only the state court can.  Instead, Skyline argues that I should narrowly interpret the

"with prejudice" language in the stipulation, and at most, limit it to damage claims arising from

the closure of the West Escalators.  (Supplemental Brief in Support of Debtor's Summary

Judgment Motion, dated May 6, 2010, at 13-14 (ECF Doc. # 41).)  It is true that "the language

'with prejudice' is narrowly interpreted when the interests of justice, or the particular equities

involved, warrant such an approach."  Dolitsky's Dry Cleaners, Inc. v. Y L Jericho Dry Cleaners,

Inc., 610 N.Y.S.2d 302, 303 (N.Y. App. Div. 1994); accord Pawling Lake Property Owners

Ass'n, Inc. v. Greiner, 897 N.Y.S.2d 729, 732 (N.Y. App. Div. 2010).  Nevertheless, the

meaning of the "with prejudice" language is subject to the usual rules of contract interpretation

through which the Court gives effect to the intention of the parties.  Breeden v. Tricom Business

Systems, Inc., 244 F. Supp. 2d 5, 14 (N.D.N.Y. 2003) (declining to afford res judicata effect to a

stipulation of dismissal with prejudice where there was "little question" that the parties intended

to continue to press their claims against each other);[11] Matter of Horton's Estate, 379 N.Y.S.2d

569, 571 (N.Y. App. Div. 1976) ("Where a stipulation does not represent the intent of the parties,

the remedy of the aggrieved party is to move in the court wherein it was entered to vacate it.")

Nevertheless, the use of "with prejudice" raises the presumption that the parties intended to give

---

[11]    Breeden included language, which Skyline cited, indicating that a court may "disregard" a stipulation of
dismissal with prejudice where the interests of justice so require.  244 F. Supp. at 14.  I do not read this to mean that
a court should, contrary to the parties' intent, disregard a stipulation of dismissal "with prejudice" in the interests of
justice.

the stipulation <u>res judicata</u> effect in a subsequent action on the same cause of action.  <u>See</u>

<u>Singleton Mgmt., Inc. v. Compere</u>, 673 N.Y.S.2d 381, 384 n.1 (N.Y. App. Div. 1998).

The parties' stipulation of discontinuance with prejudice is unambiguous and

straightforward, dismissing the <u>entire</u> state court action.  This included the claim for a

declaratory judgment that the Original Lease and the common law gave Skyline the right of

ingress to and egress from its premises via the West Escalator.  Skyline has not offered any

evidence to overcome the presumption that the parties intended the stipulation to have <u>res</u>

<u>judicata</u> effect.  There is certainly no basis in the language of the stipulation or in any other

submission to conclude that the parties intended to limit the "with prejudice" language to the

damage claims asserted in the fourth and fifth causes of action.

Because the Court cannot vacate the stipulation which it is inextricably intertwined with

the May 2005 Agreement, the Court cannot rescind the May 2005 Agreement and return the

parties to the <u>status quo</u>.[12]  In fact, the rescission of the May 2005 Agreement would have a

Draconian effect on Skyline.  The state court stipulation bars any claim that Skyline had a

contractual or common law right to use the West Escalators to access its premises.  If the May

2005 Agreement, which is the only source of the right to use the West Escalators, is rescinded,

Skyline will be barred from using the West Escalators.

Accordingly, the Court concludes that the rescission claim is barred as a matter of law,

and Skyline is entitled to summary judgment dismissing the Third Claim for Relief to the extent

---

[12]        Ordinarily, this would not necessarily be fatal.  Skyline might be able to return to state court and vacate the
stipulation of discontinuance.  Under the circumstances, however, this would be a futile exercise.  The Court has
already decided that Skyline cannot rescind the May 2005 Agreement because it is indivisible from the Existing
Lease and License and because Skyline has assumed the May 2005 Agreement.  The latter grants the very rights that
Skyline sought to vindicate in the state court action.  Hence, it would serve no purpose to vacate the state court
stipulation in order to litigate whether the Original Lease and the common law grant the same rights as the May
2005 Agreement.

that it asserts a cause of action to rescind the May 2005 Agreement.  In light of this

determination, it is unnecessary to consider the other grounds asserted by ESB in support of its

motion for judgment on the pleadings or summary judgment dismissing the rescission claim.

**C.      The Electricity Charges Claims**

**1.      Introduction**

Paragraph 42 of the Original Lease obligated Skyline to pay electrical charges as

additional rent.  The amount of the additional rent, or Electrical Rent Inclusion Factor ("ERIF"),

was initially set at $2.75 per rentable square foot, but a footnote to Paragraph 42 stated that "the

ERIF based on the survey initially made hereunder of Tenant's electricity consumption after it

opens for business in the demised premises will be substantially higher then the $2.88 being so

paid prior to said survey."   The main paragraph explained that the ERIF

> has been partially based upon an estimate of the Lessee's connected electrical
> load, which shall be deemed to be the demand (KW), and hours of use thereof,
> which shall be deemed to be the energy (KWH), for ordinary lighting and light
> office equipment and the operation of the usual small business machines,
> including Xerox or other copying machines (such lighting and equipment are
> hereinafter called "Ordinary Equipment") during ordinary business hours
> ("ordinary business hours" shall be deemed to mean 50 hours per week), with
> Lessor providing an average connected load of 4 1/2 watts of electricity for all
> purposes per rentable square foot.  Any installation and use of equipment other
> than Ordinary Equipment and/or connected load and/or any energy usage by
> Lessee in excess of the foregoing shall result in adjustment of the ERIF as
> hereinafter provided

The ERIF was subject to adjustment, _inter alia_, based upon the results of future electrical

surveys conducted by ESB.  Paragraph 42 provided:

> Lessor's electrical consultant may from time to time make surveys in the demised
> premises of the electrical equipment and fixtures and the use of the current. (i) If
> any such survey shall reflect a connected load in the demised premises in excess
> of 4 1/2 watts of electricity for all purposes per rentable square foot and/or energy
> usage in excess of ordinary business hours (each such excess is hereinafter called
> "excess electricity"), then the connected load and/or the hours of use portion(s) of
> the then existing ERIF shall be increased by an amount which is equal to a
> fraction of the then existing ERIF, the numerator of which is the excess electricity

27

(i.e., excess connected load and/or excess usage) and the denominator of which is
the connected load and/or the energy usage which was the basis for the
computation of the then existing ERIF.

If Skyline disputed the results of the electrical survey and resulting ERIF, paragraph

42(C) established a procedure for resolving those disputes:

The determination by Lessor's electrical consultant shall be binding and
conclusive on Lessor and on Lessee from and after the delivery of copies of such
determinations to Lessor and Lessee, unless within fifteen (15) days after delivery
thereof, Lessee disputes such determination.  If Lessee so disputes the
determination, it shall, at its own expense, obtain from a reputable, independent
electrical consultant its own determinations . . . . Lessee's consultant and Lessor's
consultant then shall seek to agree.  If they cannot agree within thirty (30) days
they shall choose a third reputable electrical consultant . . . to make similar
determinations which shall be controlling.

## 2.      The Eleventh Claim for Relief

The Eleventh Claim for Relief seeks specific performance of the dispute resolution

procedure in paragraph 42.  Skyline alleges that the Original Lease required it to pay an ERIF of

$2.88 per rentable square foot, (SAC at ¶ 172), and any increase had to be based upon the

determination of a qualified electrical consultant hired by ESB.  (Id. at ¶ 173.)  ESB increased

the ERIF to $3.45 per rentable square foot, but ignored repeated requests for the documentation

relating to the consultant's determination.  (Id. at ¶ 174.)  In addition, Skyline invoked the

dispute resolution procedure—the audit process—under Paragraph 42, but ESB ignored

Skyline's demand.  (Id. at ¶ 177.)

The Eleventh Claim for relief appears to relate to a survey dated January 4, 2008 by

ESB's electrical consultant, Electrical Meter Co.  (See Certification of Charles A. Stewart, III in

Opposition to Motion for Summary Judgment, dated July 23, 2009, at Ex. O (ECF Doc. # 26).)

This, however, is not free from doubt.  The parties' submissions also discussed a retroactive

increase imposed at the end of 2007 resulting from previous billing errors that may or may not relate to the $3.45 increase.

Furthermore, ESB's proof did not clarify the record. It cited to the deposition testimony of Skyline's controller, Donald Bernkopf, (see Nisim Affidavit, Ex. Z), to show that Skyline always received the back up for the electrical charges, hired a consultant in January 2008 who thought the electrical determinations that ESB had billed were probably correct, and Skyline never invoked the dispute resolution process. (See Statement of Undisputed Facts, dated July 17, 2009, at ¶¶ 87-89, 91-94 (ECF Doc. # 14).) It is unclear, however, from an examination of the cited testimony whether all of the questions and answers related to the $3.45 increase. In particular, Bernkopf was questioned about specific documents that were either not provided to the Court or were not identified sufficiently at the deposition to allow the Court to locate them if they are already part of the record. As ESB has failed to show that it is entitled to judgment as a matter of law, the motion for summary judgment dismissing the Eleventh Claim for Relief is denied.

### 3.    The Twelfth Claim for Relief

The Twelfth Claim for Relief in Skyline's Second Amended Complaint seeks declaratory and monetary relief, again relating to the electricity charges imposed by ESB. First, Skyline contends that ESB violated public policy and was unjustly enriched by reselling the electricity it bought from Con Edison to its tenants at a profit. (SAC at ¶¶ 187, 189.) Second, Skyline argues that ESB over billed Skyline for electricity usage that exceeded its approximate actual usage and received excessive cost of living adjustments based on the excessive electricity charges. (Id. at ¶¶ 191-92.)

ESB moved to dismiss, making two arguments.  First, Skyline's quasi-contractual claim for unjust enrichment was barred by the existence of the Original Lease.  Second, Skyline's anti-profiting claim has been rejected by the New York courts.  In response, Skyline filed a Third Amended Complaint that converted the unjust enrichment portion of the old Twelfth Claim into a claim for breach of contract.  This mooted ESB's first argument, but the Third Amended Complaint did not affect the anti-profiting claim.

As discussed earlier, the electrical charges payable by Skyline are governed by paragraph 42 of the Lease.  The Lease includes a base charge subject to increase if a survey reflects either a "connected load . . . in excess of 4 1/2 watts of electricity for all purposes per rentable square foot and/or energy usage in excess of ordinary business hours."  The ERIF is also subject to increases resulting from cost of living adjustments under paragraph 46.  The Lease does not key the ERIF to the amount that ESB pays Con Edison for the electricity, and does not prevent ESB from charging its tenants more than it pays.

The terms of the Lease foreclose the anti-profiting argument; the sole question is a contractual one—did ESB compute the ERIF in accordance with the Lease.  Accurate Copy Service of Am., Inc. v. Fisk Building Assocs. L.L.C, Index No. 101802/08 (N.Y. Sup. Ct. May 12, 2009)[13] is directly on point.  There, the tenants in 250 West 57th Street commenced a litigation challenging the method of computing the ERIF, which, as here, was governed by a lengthy provision of the parties' leases.  The plaintiffs alleged, inter alia, that the charges were onerous, unconscionable and against public policy because they allowed the landlord to charge additional rent that exceeded its cost for utility service, and allowed it to earn a profit from the resale of electricity to the tenants.  See id. at 2, 7.

---

[13]        A copy of the decision is attached to the Nisim Affidavit as Exhibit GG.

The New York Supreme Court dismissed the claim.  Noting that the plaintiffs did not

allege that the landlord had failed to charge for electrical service in accordance with the terms of

their leases, id. at 5, the court concluded:

> The claim that the enforcement of the Lease provisions as to the electricity
> adjustment violates public policy is belied by the Court of Appeals decision in
> George Backer Mgt. Corp. v. Acme Quilting Co., (46 NY2d at 218
> ["Significantly, the lease contains no requirement that rent escalations be
> measured by actual costs as opposed to the common industry-wide criterion
> chosen by the parties here."]). . . . Indeed, the public policy in New York is to
> respect negotiated commercial leases (see Holy Props. V. Cole Prods., 87 NY2d
> 130, 134 [1995]).

Id. at 7.

Accurate Copy Service was recently affirmed by the Appellate Division, First

Department.  Accurate Copy Service of Am., Inc. v. Fisk Building Assocs. L.L.C, N.Y. Co., 899

N.Y.S.2d 157 (N.Y. App. Div. 2010).  Echoing the reasoning of the trial court, the appellate

court ruled:

> Plaintiffs' policy-based arguments are also unavailing, as the public policy
> in New York is to respect negotiated commercial leases (see e.g. Holy Props. v.
> Cole Prods., 87 N.Y.2d 130, 133-134, 637 N.Y.S.2d 964, 661 N.E.2d 694
> [1995]).  "[A] lease is subject to the rules of construction applicable to any other
> agreement" and "[o]nce a contract is made, only in unusual circumstances will a
> court relieve the parties of the duty of abiding by it" (George Backer Mgt. Corp.
> v. Acme Quilting Co., 46 N.Y.2d 211, 217, 218, 413 N.Y.S.2d 135, 385 N.E.2d
> 1062 [1978]).

Id. at 159-60.

Furthermore, the only case cited by Skyline actually supports ESB's position.  In

Compton Advertising, Inc. v. Madison-59th Street Corp., 398 N.Y.S.2d 607 (N.Y. Sup. 1977),

aff'd, 407 N.Y.S.2d 436 (N.Y. App. Div. 1978), the landlord agreed to supply electricity to the

tenant under an electricity rider, and the tenant agreed to pay for the electricity as additional rent.

The rider set a base rent, and authorized changes in the electricity charges based upon changes in

31

the amount that Con Edison charged the landlord or upon the results of surveys similar to the

type mentioned in paragraph 42.  After the landlord increased the electricity charge, the tenant

brought the lawsuit alleging, inter alia, that the rider allowed the landlord to profit from the

resale of electricity in violation of New York public policy.

The tenant's public policy argument was based on the landlord's alleged violation of a

Con Edison tariff authorized and approved by a 1951 New York Public Service Commission

("PSC") regulation.  The tariff allowed the landlord to redistribute electricity to its tenants, but

prohibited the resale or special charge (or the metering or sub-metering) of any electricity so

distributed.  Id. at 609.  The purpose of the tariff was to end the prior practice of sub-metering

and reselling electric current for a profit.  Id.

Despite the tariff and its purpose, the court concluded that a separate rent inclusion clause

was not illegal.  Although the tariff prohibited measurement of any type as the basis for the

electricity charge:

> [I]t is equally clear that the PSC order and Con. Ed. tariff do not prohibit rent
> inclusion when the landlord provides such service.  Patently the landlord must use
> some method of measurement and computation in fixing the charge to tenant to be
> included in the rent.  Tenant contends that any method of rent inclusion which
> separates the charge for electricity from the rest of the rent and provides for its
> escalation or reduction depending upon increased or decreased use and increased
> or decreased rates by Con. Ed. to the landlord violates the PSC order.  However,
> this ignores reality.
>
> . . . .
>
> Since there is no certain way to avoid landlord profit or loss on electricity without
> direct metering and the PSC has not seen fit to require direct metering in cases
> such as that at bar, it must be concluded that the procedure adopted by the
> landlord here is not illegal and does not violate the PSC regulation and order and
> the Con. Ed. tariff.  The mere fact that a profit was made in this case is not
> dispositive of the question of illegality.  Determination as to whether a procedure
> is illegal does not turn on whether a profit is made.

Id. at 611.

Skyline's anti-profiting argument lacks merit, and must be rejected as a matter of law.

The dispute relating to the amount of electrical charges is a contractual one, and the public policy

of New York will be served by enforcing the parties' bargain.  Accordingly, the portion of the

Twelfth Claim for Relief (in the SAC as well as the Third Amended Complaint) that asserts an

anti-profiting claim is dismissed with prejudice, but without prejudice to any contract claim that

ESB computed or charged for electricity service in breach of the parties' agreements.

### 4.        Skyline's Motion for Summary Judgment

The final issue concerns Skyline's motion for partial summary judgment.  It seeks a

determination that the method of computing the ERIF under paragraph 42 is ambiguous.

According to Skyline, the electricity charges should be based on actual consumption or estimated

actual electrical consumption while ESB maintains that it should be based on Skyline's capacity

for consumption.  Skyline does not seek any other relief.

Skyline's motion is improper.  Rule 56 allows a party to move "for summary judgment

on all or part of the claim" asserted by or against the party.  "The plain language of Federal Rule

of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle

for fragmented adjudication of non-determinative issues."  S.E.C. v. Thrasher, 152 F. Supp. 2d

291 (S.D.N.Y. 2001); accord Melini v. 71st Lexington Corp., No. 07 Civ. 701 (JCF), 2009 WL

413608, at * 3 (S.D.N.Y. Feb. 13, 2009) ("In general, 'it is not appropriate to use summary

judgment as a vehicle for fragmented adjudication of non-determinative issues' because such

motions waste judicial resources.") (quoting Thrasher).  While paragraph 42 is clearly germane

to the contract claim relating to the appropriate electricity charges, Skyline is essentially asking

for summary judgment that it would be inappropriate to grant summary judgment on that

33

contract claim.  Neither Skyline nor ESB have made that motion, and consideration of Skyline's

motion would waste judicial resources.  Consequently, the motion is denied.

The parties are directed to settle a proposed order consistent with this opinion, and

contact chambers to schedule a pre-trial conference to consider further proceedings.

Dated: New York, New York
       June 21, 2010

                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                              United States Bankruptcy Judge